**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

WESTFIELD INSURANCE COMPANY,

*Plaintiff*,

v. No. 2:24-cv-00179-SMD-DLM

ISIGHT RPV SERVICES, LLC, *et al.*,

*Defendants*.

**ORDER GRANTING GREPOW, INC.'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION**

This matter is before the Court on Defendant Grepow, Inc.'s Motion to Dismiss the Amended Complaint for lack of personal jurisdiction (the "Motion"), filed August 18, 2025. Doc. 54. Plaintiff Westfield Insurance Company filed its response (the "Response") on July 31, 2025. Doc. 58. Defendant filed its reply (the "Reply") on August 19, 2025. Doc. 60. In brief, Grepow, Inc., asserts that New Mexico lacks both general and specific personal jurisdiction over it and that the claims against it should be dismissed; Plaintiff opposes the Motion and asserts that New Mexico has specific personal jurisdiction. *See* Docs. 54, 58. The Court has reviewed the parties' submissions, the record, and the relevant law, and for the reasons below, the Motion is GRANTED.

**BACKGROUND**

Plaintiff Westfield Insurance Company ("Westfield") is a foreign insurance corporation authorized to conduct business within New Mexico. Doc. 46 ¶ 1. Westfield insured Ambience Hospitality 1, LLC ("AH1"), with the policy providing for coverage for damage caused by the negligence of others to property owned by AH1 located at 223 West 2nd Street, Portales, New Mexico. *Id.* ¶ 2. Defendant iSight RPV Services, LLC ("iSight"), is a North Dakota company

with its principal place of business in North Dakota. Defendant Brandon James Cooksey, a North Dakota resident, was an employee of iSight acting within the scope of his employment during the incident at issue. *Id.* ¶¶ 3–4. Defendant Grepow, Inc. ("Grepow"), is a California corporation with its principal place of business in California. *Id.* ¶ 5. Defendant SkySpecs, Inc. ("SkySpecs"), is a Delaware corporation with its principal place of business in Michigan. *Id.* ¶ 6.

Plaintiff asserts in the operative second amended complaint that, on June 19, 2023, Mr. Cooksey rented a room at 223 West 2nd Street, Portales, New Mexico (the "Property"). He brought with him defective drone batteries. During the morning hours of June 20, 2023, Mr. Cooksey noticed smoke from one of the batteries and "immediately applied fuel to the battery causing a significant escalation of the event that up to that point may have been containable had proper battery protocols been applied." *Id.* ¶ 8. A fire occurred at the Property, resulting in damage and loss of business income. *Id.* ¶ 11.

Plaintiff asserts that Grepow distributes batteries, parts, and services to individuals in New Mexico, either by itself or in conjunction with other companies, and markets its products in New Mexico via its website. *Id.* ¶¶ 13–16. SkySpecs owns and operates drones and contracts with iSight to carry out inspections of the blades of windmills located in windmill farms in New Mexico. *Id.* ¶¶ 20–21.

The Court entered a scheduling order on April 16, 2024. Doc. 12. After Plaintiff indicated it intended to file a motion to amend and did not do so by the applicable deadline, the assigned magistrate judge called a status conference. At the conference, counsel for Plaintiff indicated that he was awaiting Grepow's motion to dismiss. Doc. 33. Thereafter, the Court entered an order extending the deadline for Plaintiff to file a motion to amend and permitting the parties to conduct jurisdictional-related discovery in regard to Grepow's intended filing of a motion to dismiss on the

basis of jurisdiction. Doc. 34.

## I. Grepow's Factual Representations Regarding Jurisdiction

In the Motion, Grepow states that the model of battery at issue in the incident is a "Tattu 30c 12000mah 22.2v 6cell" battery (hereinafter "Tattu battery"). Doc. 54 at 1. Grepow attaches to its motion the declaration of Xia Hong, Chief Executive Officer of Grepow. *See* Doc. 54-2 ("Hong Decl."). Ms. Hong states that Grepow has never been organized under the laws of New Mexico. Grepow does not have its headquarters in New Mexico, and does not have any offices, stores, manufacturing facilities, warehouses, real property, bank accounts, financial accounts, employees, or mailing addresses within New Mexico. Grepow is not registered to do business in New Mexico and does not operate or do business within the state, nor has Grepow entered into any contracts in the state or sent any representatives to trade shows within the state. *Id.* ¶¶ 6–16.

Ms. Hong states that Grepow sells commercial drone batteries through dealers or distributors but is unaware of any such dealers or distributors in New Mexico; Grepow does not control or direct to whom these entities sell products and does not know if they sell the Tattu battery to New Mexico consumers. Grepow has a website to sell its products and orders have been shipped to New Mexico but Grepow has not specifically targeted New Mexico consumers. Some retailers in New Mexico may sell other Grepow products, such as smaller batteries for toy drones, but they do not sell the Tattu battery. Ms. Hong declares that, to Grepow's knowledge, no New Mexico retailer sells any of its batteries for commercial drones or inspection drones. *Id.* ¶¶ 17–20.

Ms. Hong states that between January 1, 2021, and the date of her declaration (i.e., June 27, 2025), Grepow has shipped two orders containing the Tattu battery to New Mexico; the orders contained multiple batteries and were sold and shipped to the same customer. Between January 1,

2021, and the date of Ms. Hong's declaration (June 27, 2025), sales of the Tattu battery shipped to New Mexico accounted for "less than 0.3% of all sales for this type of battery in North America." Between January 1, 2021, and the date of Ms. Hong's declaration (June 27, 2025), Grepow sold many Tattu batteries to SkySpecs, with 14 orders during this time and each order containing multiple batteries; all were shipped to Ann Arbor, Michigan. None of the batteries sold to SkySpecs were shipped by Grepow to New Mexico and Grepow did not control or direct what SkySpecs did with these batteries after their delivery. Grepow was not involved in the business relationship between SkySpecs and iSight nor in SkySpecs' arrangement with iSight or its employees or contractors regarding use of drones, batteries, or chargers, or in their performance of inspections for SkySpecs. *Id.* ¶¶ 21–27.

Ms. Hong states that Grepow was not involved in transportation of the Tattu battery at issue into New Mexico, that she is not aware of any connection between Grepow's "very limited sales of this type of battery in New Mexico" and either "the sale of the battery at issue" or the "incident alleged" to have occurred in Portales, New Mexico. Grepow's website (grepow.com) is owned and managed by Grepow's parent company, Shenzhen Grepow Battery Co., Ltd. *Id.* ¶¶ 28–31. Grepow asserts that this is not the site through which it sells its products; that site is genstattu.com. Doc. 54 at 3–4 (citing Exs. D, E).

## II. Westfield's Factual Representations Regarding Jurisdiction

In the operative complaint, Plaintiff asserts that Grepow "does substantial business in the State of New Mexico in that it actively seeks to serve the New Mexico market for drone batteries," and that it "distributes and/or ships parts, replacement parts and services to its individual customers in New Mexico." Doc. 46 ¶¶ 12, 14. Plaintiff advances claims of negligence against Grepow for breach of duty in "failing to exercise reasonable care in the design, manufacture or warnings of its

drone batteries." *Id.* ¶ 35.

Westfield asserts that Grepow "may not build [the Tattu battery] in the United States, but it certainly distributes and markets this product" and other battery-related products across the country, and conducts a "substantial amount of business in New Mexico" where it "directly sells and ships to residents and four retail outlets." Grepow "operates an interactive website" that contacts residents within the state and "continuously sells products in the state." Doc. 58 at 2.

Westfield states that "Grepow has sold a total of 1,387 total units in New Mexico between 2021 and 2025 alone"; in support, Westfield attaches Grepow's supplemental disclosures pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure. *Id.* at 7 (citing Ex. A). A review of Exhibit A evidences that this sales number consists of all batteries sold through Grepow's website from 2021 to April 28, 2025, and inclusive of the Tattu battery, 14 of which were sold in this timeframe. *See id.*, Ex. A at 1. The total number sold of 1,387 does not include sales made via retailers, Amazon, or other online retailers. *Id.*

Westfield provides that "Grepow markets to all 50 states, including New Mexico"; in support, Westfield attaches a portion of the transcript of the deposition of Chengbing Hu. *Id.* (citing Ex. B at 49:12–16). Westfield does not set forth in its opposition the precise relationship of Chengbing Hu to Grepow, only that Mr. Hu is an employee of Grepow. *See id.* Nor is Mr. Hu's role set forth in the attached portion of the deposition transcript. *See id.*, Ex. B. It is unclear precisely what role Mr. Hu has at Grepow, particularly as the portion of the deposition transcript provided by Westfield is substantially incomplete. Westfield represents that "Grepow has established distribution agreements with four brick and mortar stores in [New Mexico] and has sold 668 units through the stores," with the stores listed as "Duncan's RC, Finish Line RC, Drone Max and Hobby Proz." *Id.* at 7 (citing Ex. A). Grepow also sells to at least one distributor for

which Grepow is "aware they end up selling to people in New Mexico." *Id.* (citing Ex. B at 45:5–7).[1]

From 2021 to April 28, 2025, Grepow has "sold 1,338 units in the state of New Mexico using Amazon." *Id.* (citing Ex. A at 3). A review of Exhibit A evidences that these units were batteries, however none were Tattu batteries. *See id.*, Ex. A at 3. From 2021 to April 28, 2025, Grepow also sold two batteries to customers in New Mexico by online retail through Walmart; both were sold in 2022 and neither were the Tattu battery. In that timeframe, no other sales were made to New Mexico customers by Grepow through any other online retailer. *Id.*, Ex. A at 4.

**LEGAL STANDARD**

Plaintiff bears the burden of establishing personal jurisdiction. *See XMission, L.C. v. Fluent LLC*, 955 F.3d 833, 839 (10th Cir. 2020). "[A]ny factual disputes in the parties' affidavits must be resolved in plaintiffs' favor." *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1070 (10th Cir. 2008). When a district court rules on a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction without holding an evidentiary hearing . . . the plaintiff need only make a prima facie showing of personal jurisdiction to defeat the motion." *Eighteen Seventy, LP v. Jayson*, 32 F.4th 956, 965 (10th Cir. 2022); Fed. R. Civ. P. 12(b)(2).

In other words, the plaintiff may defeat a motion to dismiss by presenting evidence—either uncontested allegations in its complaint or evidence in the form of an affidavit or declaration—"that if true would support jurisdiction over the defendant." *Eighteen Seventy*, 32 F.4th at 964–65; *XMission*, 955 F.3d at 839.

To determine whether the plaintiff has met this standard, the court applies a two-part test. The party seeking to establish personal jurisdiction over a foreign litigant must show: first, that the

[1] Plaintiff's citation appears to be incorrect. The information in Plaintiff's brief is found instead in Exhibit B at page 31, lines 16 to 23.

exercise of jurisdiction is sanctioned by the state's long-arm statute; and second, that it comports with the due process requirements of the Fourteenth Amendment. *Eighteen Seventy*, 32 F.4th at 965; *Marcus Food Co. v. DiPanfilo*, 671 F.3d 1159, 1166 (10th Cir. 2011).

In applying the second part of this test, a court may exercise specific personal jurisdiction over a non-resident defendant only when that defendant has the requisite "minimum contacts" with the forum state, such that having to defend the lawsuit there would not "offend 'traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945); *Eighteen Seventy*, 32 F.4th at 965.

**DISCUSSION**

Pursuant to Fed. R. Civ. P. 4(k)(1)(A), the Court's jurisdictional reach is tied to the forum state's personal jurisdiction statute, which in this case is coextensive with constitutional limits.[2] *See Tercero v. Roman Cath. Diocese of Albuquerque*, 48 P.3d 50, 54 (N.M. 2002). Because New Mexico's long-arm statute extends to the full reach of due process, the jurisdictional inquiry collapses into the constitutional analysis. *Trujillo v. Williams*, 465 F.3d 1210, 1217 (10th Cir. 2006). The Court will first address whether general personal jurisdiction exists, before turning to specific personal jurisdiction.

**I. Grepow's Contacts with New Mexico Do Not Confer General Personal Jurisdiction**

"With respect to a corporation, the place of incorporation and principal place of business are paradigm bases for general jurisdiction." *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014) (alterations omitted). However, even where a corporation's place of incorporation and principal

[2] New Mexico's long-arm statute provides for personal jurisdiction over "[a]ny person, whether or not a citizen or resident of this state, who . . . submits himself or his personal representative to the jurisdiction of the courts of this state as to any cause of action arising from . . . the transaction of any business within this state." N.M. Stat. Ann. § 38-1-16(A)(1) (1971); *Fireman's Fund Ins. Co. v. Thyssen Min. Constr.*, 703 F.3d 488, 493 (10th Cir. 2012).

place of business are not within the forum state, a court "may assert general jurisdiction over foreign (sister-state or foreign-country) corporations to hear any and all claims against them when their affiliations with the State are so 'continuous and systematic' as to render them essentially at home in the forum State." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011). The claim at issue need not be related to those "continuous and systematic" affiliations. *Dudnikov*, 514 F.3d at 1078. If a corporation's contacts render it essentially at home within the forum state, the state may exercise jurisdiction over it regarding any matter, regardless of whether the matter arises out of or relates to the corporation's contacts with the state. *See Perkins v. Benguet Consol. Min. Co.*, 342 U.S. 437, 446–47 (1952).

Here, Plaintiff fails to assert facts sufficient to show that Grepow's affiliations with New Mexico establish general jurisdiction. Maintaining a website does not, by itself, subject the owner or operator of that website to personal jurisdiction. This is true even for actions that relate to the website. A website alone can establish general personal jurisdiction over a defendant, but only where the defendant has deliberately used its website to conduct commercial transactions "on a sustained basis with a substantial number of residents of the forum"; the commercial activity must be "in such a sustained manner that it is tantamount to actual physical presence within the state." *FITn40, LLC v. Glanbia Nutritionals (Ireland) Ltd.*, No. 2:20-cv-00871-JNP-DAO, 2022 WL 79910, at *3 (D. Utah Jan. 7, 2022) (citing *Shrader v. Biddinger*, 633 F.3d 1235, 1241, 1243, 1246 (10th Cir. 2011)).

Westfield asserts that Grepow "may not build [the Tattu battery] in the United States, but it certainly distributes and markets this product" and other battery-related products across the country, and that it "operates an interactive website" that contacts residents within the state and "continuously sells products in the state." Doc. 58 at 2. Westfield states that Grepow has sold a

total of 1,387 total batteries in New Mexico between 2021 and April 28, 2025, by way of its website. *See id.*, Ex. A at 1. This total does not include sales made via retailers, Amazon, or other online retailers. *Id.*

Grepow states that it has never been organized under the laws of New Mexico and does not have its headquarters in New Mexico, nor does it have any offices, stores, manufacturing facilities, warehouses, real property, bank accounts, financial accounts, employees, or mailing addresses within New Mexico. Grepow is not registered to do business in New Mexico and does not operate within the state, nor has Grepow entered into any contracts in the state or sent any representatives to trade shows within the state. *See* Hong Decl. Westfield does not contest any of these representations. *See* Doc. 58.

Thus, for purposes of evaluating whether Grepow is "essentially at home" within New Mexico, the primary consideration is Grepow's website. In terms of sales via Grepow's website to New Mexico customers in the years ranging from 2021 to April 28, 2025, the record shows Grepow has sold a total annual number of batteries between 170 (in 2022) and 374 (in 2024). *See id.*, Ex. A. Additionally, Grepow has established distribution agreements with four brick and mortar stores in New Mexico and has sold 668 units through the stores, and also sells to at least one distributor for which Grepow is "aware they end up selling to people in New Mexico." *Id.* at 7 (citing Ex. B).

The facts before the Court do not demonstrate the "continuous and systematic" affiliations necessary to establish general personal jurisdiction. As explained by another judge of this Court:

> Even assuming that GoFit, LLC's products are selling like hotcakes across the state, it does not take an economist to conclude that GoFit, LLC's sales of personal exercise equipment to New Mexicans likely pale in comparison to Daimler's sales of Mercedes–Benz vehicles to Californians, *see Daimler AG v. Bauman*, 134 S.Ct. at 752, or a helicopter manufacturer's four million dollars in total transactions with Texans, *see Helicopteros*, 466 U.S. at 411, 418, 104 S.Ct. 1868—both of which the

Supreme Court found insufficient to establish general personal jurisdiction. *Fabara v. GoFit, LLC*, 308 F.R.D. 380, 403 (D.N.M. 2015), *as amended* (Aug. 20, 2015).

Thus, and as Plaintiff provides no argument in the Response as to the existence of general personal jurisdiction, the Court finds that no such jurisdiction is established. *See* Doc. 58; *Fabara*, 308 F.R.D. at 402–03; *Glovebox Techs. Inc. v. Da Cruz*, No. 23-cv-01222-NYW-STV, 2024 WL 1051950, at *4 (D. Colo. Mar. 11, 2024) ("Glovebox does not allege . . . that CAR intentionally directed its internet activity at Colorado, that its website singled out Colorado or Colorado residents in any way, or that CAR used its app or website to interact with a substantial number of Colorado residents on a sustained basis. CAR's maintenance of a website that is accessible across the country is insufficient to subject it to the personal jurisdiction of Colorado courts.").

**II. Grepow's Contacts with New Mexico Do Not Establish Specific Personal Jurisdiction**

Exercising specific personal jurisdiction over a nonresident defendant comports with due process "so long as there exist minimum contacts between the defendant and the forum State." *Intercon, Inc. v. Bell Atl. Internet Sols., Inc.*, 205 F.3d 1244, 1247 (10th Cir. 2000) (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291 (1980)). Those minimum contacts exist when, first, "the defendant has 'purposefully directed' its activities toward the forum jurisdiction and, second, the plaintiff's claims arise out of those forum-directed activities. *In re Application to Enforce Admin. Subpoenas Duces Tecum of S.E.C. v. Knowles*, 87 F.3d 413, 418 (10th Cir. 1996) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)); *Trujillo*, 465 F.3d at 1217–18. Unlike general jurisdiction, specific jurisdiction is "premised on something of a quid pro quo: in exchange for 'benefitting' from some purposive conduct directed at the forum state, a party is deemed to consent to the exercise of jurisdiction for claims related to those contacts." *Dudnikov*, 514 F.3d at 1078.

a. Plaintiff Has Shown Purposeful Direction by Grepow

The Court concludes that Plaintiff has shown that Grepow purposefully directed its activities toward New Mexico.

When a defendant timely challenges personal jurisdiction, the plaintiff bears the burden of establishing that the Court may exercise personal jurisdiction over the defendant and that doing so would not violate due process. *Walker v. THI of New Mexico at Hobbs Ctr.*, 801 F. Supp. 2d 1128, 1139 (D.N.M. 2011); *see Overton v. United States*, 925 F.2d 1282, 1283 (10th Cir. 1991). At this stage, the Court does not resolve disputed facts. *Id*. Rather, the Court "must accept the plaintiff's (properly documented) evidentiary proffers as true for the purpose of determining the adequacy of the prima facie jurisdictional showing." *Id*.

Applying this standard, the plaintiff need only make a prima facie showing of personal jurisdiction to defeat defendant's motion. *Eighteen Seventy*, 32 F.4th at 965. Plaintiff may make such a showing "by demonstrating, via affidavit or other written materials, facts that if true would support jurisdiction over the defendant." *OMI Holdings, Inc. v. Royal Ins. Co. of Canada*, 149 F.3d 1086, 1091 (10th Cir. 1998); *Old Republic Ins. Co. v. Cont'l Motors, Inc.*, 877 F.3d 895, 903 (10th Cir. 2017). The complaint's well-pled factual content "must be accepted as true if uncontroverted by the defendant's affidavits," and "factual disputes . . . must be resolved in the plaintiff's favor when the parties present conflicting affidavits." *FDIC v. Oaklawn Apartments*, 959 F.2d 170, 174 (10th Cir. 1992). However, Plaintiff must "support jurisdictional allegations in a complaint by competent proof of the supporting facts if the jurisdictional allegations are challenged by an appropriate pleading." *Pytlik v. Pro. Res., Ltd.*, 887 F.2d 1371, 1376 (10th Cir. 1989); *Romero v. TitleMax of New Mexico, Inc.*, No. CV 17-775 KG/SCY, 2020 WL 4547294, at *2 (D.N.M. Aug. 6, 2020).

In brief, Plaintiff argues that Grepow conducted business within New Mexico of the same type that caused Plaintiff's injury. Plaintiff asserts that Grepow has sold a total of 1,387 units in New Mexico from 2021 to April 28, 2025, and established distribution agreements with four brick and mortar stores within the state through which it has sold 668 units. Plaintiff states that Grepow's sale of batteries and related equipment, even if such sales were not of the Tattu battery, is the same type of activity as alleged in its claims. Doc. 58 at 6–7.

In the Motion, Grepow does not advance any specific arguments regarding the existence of minimum contacts. Rather, the Motion disputes that the sale of the specific Tattu battery at issue was an action directed at New Mexico, and argues that Plaintiff "cannot cite a single action in New Mexico by Grepow, Inc. that gave rise to or relates to the incident in the Portales hotel on May 20, 2023." Doc. 54 at 11. The Court will address these arguments *infra* in the following subsections.

"The Tenth Circuit has not yet discussed whether specific jurisdiction can be established through online sales." *Dwight v. Third World Press Found., Inc.*, No. 24-cv-03104-PAB-STV, 2025 WL 3769069, at *4 (D. Colo. Dec. 31, 2025). Courts within this circuit, however, have found that minimum contacts can be established based upon the "substantial or regular flow of [online] sales from a non-resident company to residents of the forum state." *Id.* (collecting cases). In evaluating the quantity and regularity of sales needed to establish minimum contacts, another court of this circuit determined that "[s]even sales, one occurring in 2020 and six occurring over two days in 2023, cannot appropriately be described as 'considerable in quantity,' 'significantly great,' or 'recurring' in any sense." *SEBO Am., LLC v. Red Vacuums LLC*, No. 23-cv-0116-WJM-SBP, 2024 WL 964816, at *5 (D. Colo. Mar. 6, 2024) (comparing cases); *Ruiz-Paramo v. Aroma360, LLC*, No. 24-cv-02750-PAB-SBP, 2026 WL 1656947, at *7 (D. Colo. June 9, 2026) ("Just as the

seven orders were insufficient to establish minimum contacts in *Red Vacuums*, the single order here is also insufficient to establish minimum contacts."); *but see Leach v. Pharmedoc Inc.*, No. CIV-16-1034-M, 2017 WL 943959, at *2 (W.D. Okla. Mar. 9, 2017) (finding personal jurisdiction established where "[d]efendant has sold at least four, and likely more, of the allegedly infringing body pillows to Oklahoma residents. At least one of the pillows was sold directly from defendant's website").

However, in a separate action, another court found specific personal jurisdiction where plaintiffs alleged that the defendants sold and shipped 341 infringing products to Colorado consumers via the Amazon website for over a year, in addition to shipping over 1,000 other products to the forum state during the same time period. *See Otter Prods., LLC v. Phone Rehab, LLC*, No. 19-cv-00206-RM-MEH, 2019 WL 4736462, at *4 (D. Colo. Sept. 27, 2019), *report and recommendation adopted*, No. 1:19-cv-00206-RM-MEH, 2019 WL 6888276 (D. Colo. Dec. 18, 2019); *see also Otter Prods., LLC v. Big Birds, LLC*, No. 1:19-cv-00626-DME-KLM, 2019 WL 13102793, at *1 (D. Colo. Aug. 9, 2019) (finding purposeful direction where allegations set forth that defendants "have made substantial and regular sales of infringing products bearing Plaintiffs' trademarks to Colorado," with "at least fifty such sales occurring between November 5, 2018 and February 14, 2019," and defendants "continue to regularly sell a high volume of other infringing products bearing Plaintiffs' trademarks into Colorado and to Colorado residents").

And "[o]ther courts, when faced with the use of Amazon to transact business, have focused on the extent to which the website is used as a means for establishing regular business with a remote forum and have found jurisdiction is proper when a sophisticated seller operates a commercial business through Amazon." *Leach*, 2017 WL 943959, at *2 (citing *EnviroCare Techs., LLC v. Simanovsky*, No. 11-CV-3458 JS ETB, 2012 WL 2001443, at *3 (E.D.N.Y. June

4, 2012) (finding that the "'usual online auction process' where an unsophisticated seller uses eBay's template to post an item for sale and sells and ships the item to the highest bidder typically 'does not rise to the level of purposeful conduct required to assert specific jurisdiction,' whereas jurisdiction is proper when a sophisticated seller operates a commercial business through eBay or Amazon")); *see Big Birds, LLC*, 2019 WL 13102793, at *2 ("Nor does it matter that it is Amazon, and not Defendants, who ultimately ships the infringing goods Defendants sells in Colorado.") (citing *Leach*, 2017 WL 943959, at *2).

Here, Westfield attaches Grepow's supplemental Rule 30(b)(6) disclosures to its Response. In its disclosures, Grepow states that it sold 1,387 batteries in New Mexico from 2021 to April 28, 2025, via its website; this includes all types of batteries and is not limited to the Tattu batteries. Grepow sold 294 in 2021; 170 in 2022; 233 in 2023; 374 in 2024; and 316 in 2025 as of April 28. Grepow also sold 21 products other than batteries in that timeframe; 1 in 2021, 17 in 2024, and 3 in 2025 as of April 28. Doc. 58, Ex. A at 1. Regarding battery sales to distributors within New Mexico, Grepow provides that it sold 124 in 2021; 93 in 2022; 41 in 2023; 125 in 2024; and 265 in 2025 as of April 28. None of these sales were for Tattu batteries. *Id.* at 2. Regarding sales to New Mexico addresses via the Amazon website, Grepow provides that it sold 1,338 batteries between 2021 and April 28, 2025; none of the sales were for Tattu batteries. Grepow does not provide a breakdown of these 1,338 sales by date or year. Grepow states that it did not use an Amazon warehouse in New Mexico from 2021 to April 28, 2025. *Id.* at 3. Regarding sales to New Mexico addresses via any other online retailer besides Amazon, Grepow states that it sold two batteries from 2021 to April 28, 2025, with both sales in 2022; neither were for the Tattu battery. *Id.* at 4.

Grepow's disclosures evidence that it sold an approximate total of 3,375 batteries to

customers in New Mexico, as well as 21 other non-battery products. A substantial portion of these sales were made in a consistent and regular fashion between 2021 and April 28, 2025. The vast majority of these battery sales did not involve the Tattu battery. Of these sales, 14 were of the Tattu battery; 12 in 2022 and two in 2023 via Grepow's website. *Id.* at 1.

In light of the sales numbers provided by Grepow in its disclosures, the Court concludes that Plaintiff has met its burden to establish a prima facie showing of purposeful direction. Regular sales in the amount of 3,375 batteries and 21 other products to New Mexico customers and addresses demonstrates minimum contacts for the purposes of specific personal jurisdiction. *See Phone Rehab, LLC*, 2019 WL 4736462, at *4; *Big Birds, LLC*, 2019 WL 13102793, at *1. That a portion of these sales were made via the Amazon website does not change the analysis; Grepow is a corporation with its own website and relationships with distributors and it is reasonable to conclude it is, therefore, a "sophisticated seller." *See Leach*, 2017 WL 943959, at *2; *Big Birds, LLC*, 2019 WL 13102793, at *2.

Regardless, even if the Court were to discount the sales made via the Amazon website (a total of 1,338), the remaining sales would still number 2,058. This amount is substantial and consists of regular sales made over a number of years. *See AMB Media, LLC v. OneMB, LLC*, No. 23-5607, 2024 WL 2052151, at *4 (6th Cir. May 8, 2024) (noting that "[u]se of an interactive website to sell products into a forum creates jurisdiction not because of any internet-specific rules, but because that course of conduct pairs a willingness to sell into the forum with regular sales—features that have long constituted purposeful availment," and citing cases in agreement from sister circuits).

Having found a prima facie showing of purposeful direction by Plaintiff, the Court will turn to an evaluation of the causal element required for the exercise of specific personal

jurisdiction.

b. Grepow's Alleged Activities as Related to the Claims Were Not Directed at New Mexico

The Tenth Circuit has "not settled on a specific standard of causation for the purposeful-availment inquiry." *XMission, L.C. v. PureHealth Rsch.*, 105 F.4th 1300, 1313 n.13 (10th Cir. 2024) (noting that "there is reason to think a wholly causation-based framing of the 'arise out of or relate to' prong may be in tension with the Supreme Court's recent pronouncements on the specific-jurisdiction inquiry"). Justice Gorsuch's concurrence in the *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.* decision made clear that the Supreme Court has pivoted away from the "but-for" standard as a requirement to show a causal link for purposes of specific personal jurisdiction. *See Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351, 376 (2021) (Gorsuch, J., concurring) ("Typically, courts have read this second phrase ["relates to"] as a unit requiring at least a but-for causal link between the defendant's local activities and the plaintiff's injuries . . . . Now, though, the Court pivots away from this understanding.").

The Supreme Court explained that, regarding the "arise out of or relate to" standard, the "first half of that standard asks about causation; but the back half, after the 'or,' contemplates that some relationships will support jurisdiction without a causal showing." *Id.* at 362. It does not require "proof that the plaintiff's claim came about because of the defendant's in-state conduct." *Id.* The Tenth Circuit found that the Supreme Court "clarified that the Court's precedents did not support requiring strict causation as a general principle," and that contacts with a forum state suffice "if they satisfy the purposeful-direction requirement" and "if they regularly include activity substantially the same as that giving rise to the claim against it." *Hood v. Am. Auto Care, LLC*, 21 F.4th 1216, 1225 (10th Cir. 2021) (citing *Ford Motor Co.*, 592 U.S. at 361). "*Ford* makes clear that specific jurisdiction is proper when a resident is injured by the very type of activity a

nonresident directs at residents of the forum State—even if the activity that gave rise to the claim was not itself directed at the forum State." *Id.*

Here, there are no assertions that Grepow's alleged activities as relate to the incident were themselves directed at New Mexico. Plaintiff does not assert that one of the Tattu batteries sold in New Mexico was the particular battery that caused the incident, nor does the operative complaint set forth a breakdown of the path of the particular Tattu battery at issue. *See* Docs. 46, 58. As far as the Court can comprehend from the parties' briefing, Grepow asserts that it shipped the Tattu battery at issue to SkySpecs in Michigan. SkySpecs then shipped it to Oklahoma. There, Nate Sharrett obtained it and then brought into New Mexico, later providing it to Mr. Cooksey while within New Mexico; both Mr. Sharrett and Mr. Cooksey were employees of iSight which was conducting inspections under contract with SkySpecs. Mr. Cooksey then performed inspection jobs within New Mexico before going to Texas for another inspection job, after which he transported the battery back into New Mexico, where the incident occurred. Doc. 54 at 2–3. In support of these assertions, Grepow cites to the Hong Declaration as well as iSight's responses to Grepow's first set of interrogatories, attached to the Motion as Exhibit C.

SkySpecs, iSight, and Mr. Cooksey are all parties to this action and are not residents of New Mexico; Mr. Sharrett is not a party to the action. In its response to the Motion, Plaintiff does not directly contest these representations regarding the path of the Tattu battery at issue. Plaintiff states that, though Grepow may have only sold the Tattu battery "to one consumer in New Mexico, [] its business connections in the forum extend far beyond one sale." Doc. 58 at 6–7. Plaintiff states that "Grepow's sale of batteries and battery equipment is the same *type* of activity that is related to the fire in New Mexico." *Id.* at 7 (emphasis in original).

Grepow concedes that, if one of the Tattu batteries it sold to a New Mexico customer

caused the damage in the Portales hotel, then there would exist an "intentional sale" to a New Mexico customer which would satisfy the "arise out of or relate to" requirement, but that said facts do not exist here. Doc. 54 at 10-11. In the Reply, Grepow represents that the Supreme Court in *Ford* "emphasized the importance that its 'related to' analysis must focus on the in-forum contacts involving the same model as the product at issue in the litigated case." Doc. 60 at 4. In sum, Grepow moves that this Court consider only the sale of the Tattu battery model in regard to personal jurisdiction. *See id.*

The Tenth Circuit explained that *Ford* adopted the "proposition that the forum State can exercise personal jurisdiction over an out-of-state defendant that has injured a resident plaintiff in the forum State if (1) the defendant has purposefully directed activity to market a product or service at residents of the forum State and (2) the plaintiff's claim arises from essentially the same type of activity, even if the activity that gave rise to the claim was not directed at forum residents." *Hood*, 21 F.4th at 1224. As recounted above, the facts set forth that the activity giving rise to Plaintiff's claims was not directed at forum residents, as the Tattu battery at issue was sold in Michigan and there is no indication Grepow knew or intended the battery to ultimately reach New Mexico. Thus, the Court must consider whether the claims arise from "essentially the same type of activity" Grepow directed at residents of New Mexico.

As an initial matter, Grepow attempts to introduce an argument in the Reply that the number of total batteries sold by it in New Mexico includes another brand's batteries, Gens Ace, and that the batteries it sold in this state are different from the Tattu battery, namely because they are for remote control toys and recreational use, as opposed to the industrial use for which the Tattu battery is intended. Doc. 60 at 5–6 (citing Exhibit F).

A party waives arguments raised for the first time in their reply brief. *Gutierrez v. Cobos*,

841 F.3d 895, 902 (10th Cir. 2016). However, while a court "should not consider an entirely new argument that is raised for the first time in a reply brief," where "evidence is submitted in response to the argument asserted by plaintiff in the response . . . . defendant's argument is not new, but rebuttal evidence, and is entirely acceptable in the reply." *Advisors Excel, LLC v. Senior Advisory Grp., LLC*, No. 11-4015-JAR, 2011 WL 3489884, at *5 n.36 (D. Kan. Aug. 10, 2011).

Grepow did not advance any arguments regarding Gens Ace in its Motion nor attach Exhibit F thereto. Grepow's argument is offered in rebuttal to the total sales figures relied on by Plaintiff in the Response, which Grepow asserts also "include very different categories of batteries." Doc. 60 at 5–6. Grepow does not provide any detail in support of its argument that batteries sold by Gens Ace were included in the totals Plaintiff attributed to Grepow. Grepow does not provide a calculation or estimate of how many such batteries were improperly attributed to Grepow that were actually sold by Gens Ace. In fact, Grepow does not elaborate whatsoever as to what sort of entity Gens Ace is. Exhibit F merely contains screenshots of genstattu.com, showing that Gens Ace batteries are sold on the website. *See id.*, Ex. F. Thus, the Court finds that this evidence, though offered in rebuttal to representations in the Response, does not controvert them.

Additionally, Grepow included a perfunctory statement in the Motion, without any further explanation, that New Mexico retailers "may sell batteries for toy drones, which are smaller and much less expensive" than the Tattu battery. Doc. 54 at 4 (citing Hong Decl. ¶¶ 18–20). Grepow did not set forth in its Motion, with any particularity or detail, how the Tattu battery differs from the other batteries it sells within the state. *See id.* Plaintiff concedes in the Response that "each of these sales was not of the same type of battery that caused the injury," but that jurisdiction exists due to the "extensive ongoing other activity Grepow conducts in the state," including "sales of

other similar products." Doc. 58 at 10. As Plaintiff asserts that the other batteries sold by Grepow are similar products, the Court will consider Grepow's arguments in the Reply that the "total sales relied on by Plaintiff include very different categories of batteries," including those for remote control cars, helicopters, airplanes, and quadcopters that are for recreational use as toys, as opposed to the Tattu battery which is intended for industrial use in unmanned aerial vehicles. Grepow asserts that the differences include "design and intended usage, voltage, capacity and price." Doc. 60 at 5–6. Grepow does not provide any further particularity, such as the degree of difference within these categories or numbers of batteries sold for each subcategory of device. *See id.* The Court will discuss *infra* the relevance of the relationship between these products.

c. <u>Same Type of Activity - Background</u>

Most federal and state courts that have considered causation and relation in the personal jurisdiction context for a claim involving product liability have interpreted *Ford* to require forum contacts "pertaining to the specific product model at issue in the litigation." *Adams v. Aircraft Spruce & Specialty Co.*, 345 Conn. 312, 316 n.15 (2022) (collecting cases). Some courts, however, have interpreted *Ford* to permit a more extensive range of forum contacts as sufficient, and have found that the contacts need not involve the exact same product model. *See id.* at 316 (collecting cases). "These courts have indicated that forum activity relating to other models of the same product type could provide support for specific jurisdiction, if there is no basis to conclude that there is a material difference between the models." *Id.*

In *Godfried v. Ford Motor Co.*, the plaintiff alleged that he was injured by a component in a rear mower. Defendant claimed personal jurisdiction was lacking because no factual allegations linked the particular rear mower model to the defendant's in-state conduct. The court disagreed, finding that conduct related to rear mowers more generally sufficed in the absence of specific

allegations related to the rear mower model at issue because defendant extensively marketed and sold rear mowers in the state and plaintiff alleged, based on jurisdictional discovery, that defendant was unable to distinguish its manufacturing, distribution, advertising, or sales information between rear mowers generally and the specific rear mower model. The courted noted that, "It is not clear to me why it should make a difference whether Ford marketed the Rear Attached Mower Series 501 Component 14-92 (the '501 Mower') in Maine so long as it marketed rear mowers in the forum. The parties offer no evidence to indicate that the 501 Mower is so distinct from other rear mowers as to warrant this distinction." No. 1:19-cv-00372-NT, 2021 WL 1819696, at *5 n.5 (D. Me. May 6, 2021).

The *Godfried* court noted the significant lack of evidence before it as to the mower model at issue, as well as difficulty for the plaintiff in acquiring such evidence due to defendant's failure to provide it in discovery. The court expressed a concern that "Ford could potentially control where it is sued solely based on which records it decided to keep about its products. If Ford chose not to retain records about a particular product—and thus it is not knowable where that product was designed, manufactured, marketed, or sold—it would be the rare case that Ford could be sued anywhere outside of its place of incorporation or its principal place of business—that is, the places where it is 'essentially at home.'" *Id.* at *6 n.6.

In *Harding v. Cordis Corporation*, the plaintiff alleged that she was injured by a defective medical device containing a specialized component; the manufacturer of the component knew the ordering company sold the device in the United States but not in which particular states. The manufacturer also directly sold other similar products within the forum state. The *Harding* court held that there was no due process violation in requiring the manufacturer to defend itself in the forum state. The court found that "nothing in *Ford* suggests that the only way to demonstrate that

a defendant has minimum contacts with a forum state is through sales of the injurious product. Rather, as in this case, jurisdiction can be based on a combination of the sales of the offending product and other sales of similar products that, in total, provide evidence that the defendant 'purposefully directed its activities' at the forum state and that the plaintiff's claim sufficiently relates to the defendant's varied contacts with the forum state." *Harding v. Cordis Corp.*, 2021 IL App (1st) 210032, ¶ 44.

In *Sibley v. Air and Liquid Systems Corporation*, the plaintiffs alleged exposure in the 1970s to products containing asbestos manufactured, distributed, or sold by defendant. The defendant did not dispute that it had minimum contacts and challenged only the relatedness prong, stating that no evidence showed it sold the product at issue in a California market and its supply to the United States Navy had nothing to do with any such market. The *Sibley* court found that, "although, as Viking points out, Christopher Sibley 'could not specifically recall the type of Viking pump' to which he was exposed, Viking has submitted no evidence in support of its assertion that the models it supplied to the Navy are 'not the sort of pump that [it] supplied to California civilians,' let alone evidence showing how any such distinction might bear on the jurisdictional analysis." The court held that, because no evidence disputed plaintiffs' allegations that defendant supplied "asbestos-containing pumps in California," plaintiffs had made a prima facie showing as to personal jurisdiction. *Sibley v. Air & Liquid Sys. Corp.*, No. 20-cv-07697-MMC, 2021 WL 2688819, at *3 (N.D. Cal. June 30, 2021); *see also Downing v. Losvar*, 21 Wash. App. 2d 635, 661–62 (2022) ("Textron Aviation contends that the United States Supreme Court, in *Ford Motor Co. v. Montana Eighth Judicial District Court*, adopted and applied a specific product or 'kind of product' test. The Supreme Court sometimes referred to the marketing of a product, i.e., a single product line, but the Court did not base its ruling on whether Ford marketed the model of car

involved in the accidents in the respective states.").

As to cases involving foreign battery manufacturers, "courts have split on the question of exercising specific personal jurisdiction." *B.D. by & through Myers v. Samsung Sdi Co.*, 143 F.4th 757, 766 (7th Cir. 2025) (citing cases). The Seventh Circuit found that "B.D.'s stepfather purchased the individual 18650 battery that later exploded in B.D.'s pocket at an e-cigarette retail store. The battery was not encased in a pack and was therefore acquired through an unauthorized, derivative-product transaction." The court held that the "resulting products liability lawsuit thus does not relate to Samsung SDI's deliberate forum contacts. To be sure, both B.D. and Samsung SDI have Indiana affiliations. B.D. resides in the state and his injuries occurred there. And, again, Samsung SDI is affiliated with the forum through the downstream consequences of selling 18650 batteries to sophisticated customers for use as parts. But, fatal to establishing personal jurisdiction here, those independent relationships with Indiana do not overlap with one another." *Id.* at 771.

The court noted that "[b]ecause Samsung SDI structured its activities to ensure only encased 18650 batteries reached consumers in Indiana, it was not on 'clear notice' that it would have to answer for injuries occasioned by consumers obtaining individual batteries—injuries wholly unrelated to the company's in-state activities." *Id.* at 771–72. The court distinguished a scenario where, for instance, an 18650 battery exploded in a pack powering a laptop because there, the plaintiff would have acquired the battery through the stream of commerce that defendant "deliberately exploited." *Id.* at 772.

In discussing *Ford*, the Seventh Circuit stated:

> The issue presented here more closely resembles that open question than it does the question resolved in *Ford*. Samsung SDI does not market individual 18650 batteries in Indiana—it expects only batteries encased in packs to reach the state. Yet it was an individual battery that exploded in B.D.'s pocket and led to this lawsuit. Swap vehicles in for batteries and Ford in for Samsung SDI, and the differences between this case and Ford emerge. We must decide whether the

> automaker is subject to personal jurisdiction in Indiana for a consumer-plaintiff's in-state injury in a Ford Explorer when the company sells Explorers only to police departments. *See Yamashita*, 62 F.4th at 507–08 (discussing the same analogy). The rationale in *Ford* does not control on these facts. In the counterfactual, Ford would no longer have "systematically served a market" in the forum "for the very vehicle[ ]" that led to the plaintiff's injury. *Ford*, 592 U.S. at 365, 141 S.Ct. 1017. Indeed, the company did not intend for the plaintiff to get behind the wheel of an Explorer.

*Id.* at 773.74; *see also Ethridge v. Samsung SDI Co., Ltd.*, 163 F.4th 136, 139 (5th Cir. 2025), *cert. denied*, 146 S. Ct. 2794 (2026) (on panel rehearing, finding plaintiff did not satisfy *Ford's* standard for personal jurisdiction and noting that "Samsung describes the 'great lengths' it goes to prevent consumers like Ethridge from obtaining its batteries. That includes a detailed 'customer vetting process' in which prospective customers must apply to purchase 18650 batteries. Samsung then rejects any applications with connections to the e-cigarette industry. Both its website and product packaging include warnings about the risk of serious injury or death resulting from consumer usage.").

In *Yamashita v. LG Chem, Ltd.*, the Ninth Circuit, applying but-for causation, found that the plaintiff had not shown that his injuries arise out of or were related to defendants' contacts with Hawaii. Plaintiff claimed defendant negligently manufactured a battery that he used to power an electronic cigarette, after which both the cigarette and battery exploded. Plaintiff purchased the battery, known as a 18650 lithium-ion battery, from a third-party. The court noted that defendants shipped products through the port of Honolulu; some shipments went to Hawaii-based entities and contained lithium-ion batteries, but the record did not show whether these subsets overlapped or whether any shipment contained the 18650 batteries. *See Yamashita v. LG Chem, Ltd.*, 62 F.4th 496, 501 (9th Cir. 2023).

Defendants had significant sales of residential solar batteries in Hawaii and various consumer products sold within Hawaii contained batteries produced by the defendants, including

the 18650 batteries; the record did not show whether any of those batteries were brought into Hawaii by defendants nor whether, if third-parties acquire the batteries elsewhere for incorporation into their products, defendants play some role in directing batteries toward Hawaii. Plaintiff alleged defendants provided 18650 batteries for products they expect will be sold in Hawaii; a third-party website sold standalone 18650 batteries, which plaintiff alleged bought the batteries from defendants who knew they would be sold standalone in Hawaii, but defendants provided declarations denying that they authorized any such third-party sales to retailers or distributors. *See id.* at 501–02.

Finding purposeful availment, the court then analyzed the causality issue. The court noted that "*Ford* held that Ford Motor Company was subject to specific personal jurisdiction over claims of injuries caused by a Ford Explorer in Montana, and by a Ford Crown Victoria in Minnesota, despite the vehicles having been sold by Ford out-of-state." *Id.* at 505. The court found that the "large batteries installed in stationary solar-power systems and the small portable stand-alone battery at issue here are as different as sedans and 18-wheelers. There is little reason to believe that either firm's port contacts or [] solar contacts have anything to do with Hawaii residents' acquisition of 18650 lithium-ion batteries." *Id.* at 506–07.

Lastly, in *Sullivan v. LG Chem, Ltd.*, the Sixth Circuit held that "LG Chem had fair notice that it could be sued in Michigan for the Michigan consequences of defects relating to its 18650 battery, and even agreed with one company to be governed by Michigan law regarding the 18650 batteries." 79 F.4th 651, 673 (6th Cir. 2023). An 18650 battery manufactured by the defendant exploded in the plaintiff's pocket, causing severe injury. *Id.* at 657. Defendant made at least two shipments of 18650 batteries into Michigan, with one of these shipments containing over 50,000 pounds of said batteries. *Id.* at 658. The court found that "LG Chem conducted business with

Michigan companies regarding its 18650 batteries and shipped its 18650 batteries into Michigan, and Sullivan suffered injury from LG Chem's 18650 battery in Michigan . . . . Either Plaintiff ultimately purchased an 18650 battery that LG Chem directly shipped into Michigan, or the battery came from another state at the same time that LG Chem was contracting for and [] shipping that same type of battery in Michigan." *Id.* at 673.

d. Same Type of Activity – Analysis

It is Plaintiff's burden to demonstrate a prima facie showing that exercise of personal jurisdiction is appropriate. *Eighteen Seventy*, 32 F.4th at 965. Here, Grepow states that it is the Tattu battery that was involved in the incident. Plaintiff does not contest this in its Response and the exhibits attached thereto evidence that 12 units of the Tattu battery were sold in 2022 and two units were sold in 2023, with no other units sold from 2021 to April 28, 2025, within the state of New Mexico. *See* Doc. 54, Ex. A. Grepow states that these sales were in two separate orders and both to the same customer. Doc. 54 at 4 (citing Hong Decl. ¶ 21).

In the complaint, Plaintiff alleges that Grepow actively seeks to serve the market for "drone batteries," and advances claims of negligence against Grepow for breach of duty in "failing to exercise reasonable care in the design, manufacture or warnings of its drone batteries." Doc. 46 ¶¶ 12, 14, 35. In the Response, Plaintiff states that Mr. Cooksey brought "defective drone batteries" that caused the incident at issue. Doc. 58 at 1–2. Plaintiff does not contest Grepow's representation that it only sold the Tattu battery to one customer in New Mexico, instead asserting that Grepow's "business connections on the forum extend far beyond one sale." *Id.* at 6–7.

Plaintiff does not set forth in its Response that the batteries sold by Grepow within New Mexico, other than the Tattu battery, are sufficiently similar to the Tattu battery. Plaintiff does not provide any plausible allegations by which the Court can identify a prima facie basis to find that

the numerous other batteries sold by Grepow within New Mexico are similar enough to the Tattu battery that they may be considered for purposes of evaluating causation or relation. And Grepow provides some argument in its Motion and Reply that the other batteries it sells are substantially different from the Tattu battery at issue.

Plaintiff states only that "1,387 units have been sold in the state," but the exhibits attached to its Response indicate that, aside from 14 Tattu batteries, the other 1,373 batteries were other models. *Id.* at 10; *see id.*, Ex. A. It is Plaintiff's burden to show how these other 1,373 batteries, or some number of them, were sufficiently similar to the Tattu battery such that the Court should consider them alongside said battery for purposes of the personal jurisdiction analysis. Plaintiff has not carried its burden. This is unlike the facts in *Sibley*, where the court found that no evidence disputed plaintiffs' allegations that defendant supplied "asbestos-containing pumps in California," and plaintiffs had therefore made a prima facie showing as to personal jurisdiction. *See Sibley*, 2021 WL 2688819, at *3. Here, there is no analogous representation by Plaintiff that Grepow supplied other batteries with some similar defect as the Tattu battery within New Mexico. Thus, the Court cannot conclude on this record that Grepow's sales of over 3,000 other batteries from 2021 to April 28, 2025, should be considered as related.

The record before the Court is similarly unlike the facts in *Godfried*. There, the court found that conduct related to rear mowers generally sufficed in the absence of specific allegations because the defendant extensively marketed and sold rear mowers in the state and plaintiff alleged that defendant was unable to distinguish its manufacturing, distribution, advertising, or sales information between rear mowers generally and the specific rear mower model. *See Godfried*, 2021 WL 1819696, at *5 n.5. Again, there are no such allegations by Plaintiff before the Court, and the exhibits attached to the Response provide some indication that Grepow can distinguish

between battery models.

And in *Harding*, the court found that "Confluent's national distribution, through Cordis, of the custom-made nitinol component of the OptEase filter, paired with Confluent's not-insignificant sales of nitinol directly to Illinois customers for use in medical devices, are sufficient minimum contacts that are related enough to this lawsuit such that Illinois courts have specific personal jurisdiction over Confluent for these claims." *Harding*, 2021 IL App (1st) 210032, ¶ 39. The court noted that "Ms. Harding also states in her brief that '[t]he OptEase IVC filter medical device was comprised of the nitinol filter manufactured by Confluent, the delivery system, instructions for use, and other labeling materials,' suggesting that the nitinol filter custom manufactured by Confluent for Cordis was the significant component of Cordis's OptEase filter. Confluent did not refute this characterization of its product." *Id.* ¶ 7. The facts suggest a commonality between the products sold that was important to the court's decision, namely in the shared use of nitinol. There are no representations before the Court here sufficient to allow a finding that a material commonality exists between the Tattu battery and other batteries sold by Grepow that would speak to the relatedness analysis.

The facts before the Court, however, do evidence a sale of 14 units of the Tattu battery in 2022 and a sale of two units in 2023, both to the same customer. Thus, there is evidence of sales within New Mexico of the Tattu battery. Hong Decl. ¶ 21. Unlike the records before the courts in *B.D.* and *Etheridge*, Grepow does not set forth any facts that it attempted to strictly control or limit the sales of Tattu batteries in any way within New Mexico. To the contrary, Grepow states that it sells "commercial drone batteries through dealers or distributors," but is "unaware of any such dealers or distributors in New Mexico." *Id.* ¶ 18. Grepow provides that "does not control or direct to whom the dealers or distributors sell the products," and it "does not know if they sell this

product [the Tattu battery] to New Mexico customers." *Id.* ¶ 19. There are no indications of any controls implemented by Grepow regarding sales of the Tattu battery, but Grepow does state that some retailers within the state may sell other Grepow products, such as "batteries for toy drones, which are smaller and less expensive," but they do not sell the "type of battery at issue in this case [the Tattu battery]" nor, to Grepow's knowledge, do they sell its "batteries for commercial drones or inspection drones." *Id.* ¶ 20. Grepow does not offer any declarations denying that they authorized any such third-party sales to retailers or distributors of the Tattu battery, as the court had before it in *Yamashita*.

Thus, the facts before the Court are not as strong as those in *B.D.*, *Etheridge*, and *Yamashita* regarding controls implemented by Grepow to restrict flow of the Tattu battery into New Mexico. However, the record does not evidence sales numbers nearly as strong as those in *Sullivan*. There, the defendant shipped over 50,000 pounds of the subject battery into the forum state. Here, the total units sold of the Tattu battery in over four years is 14. It is highly implausible that such a number of batteries approaches the quantity sold within the forum state as in *Sullivan*. The record shows no Tattu batteries have been sold within this state since 2023.

With the record taken in total, and in light of the Tenth Circuit's guidance that the Plaintiff's claim must arise "from essentially the same type of activity, even if the activity that gave rise to the claim was not directed at forum residents" (*Hood*, 21 F.4th at 1224), the Court finds that Plaintiff has failed to make a prima facie showing that the claims arise from the same type of activity Grepow has engaged in within New Mexico. Though Grepow has regularly sold a significant number of batteries within New Mexico, the facts before the Court evidence that these batteries are different from the Tattu battery that is alleged to have caused the incident in Portales. Plaintiff presents no allegations that there is some factor of similarity between the Tattu battery

and these other batteries such that the Court should consider them together. Though Grepow has sold the Tattu battery within New Mexico, these sales consist of two shipments of a total of 14 units to one customer, with one shipment occurring in 2022 and another in 2023. The record does not show any other sales of the Tattu battery to any other customer within the state. Based upon this record, the Court cannot find that Grepow's activity within New Mexico is of essentially the same type that gave rise to Plaintiff's claims.

## III. The Court Will Not Reach the Analysis Relating to Fair Play or Substantial Justice

When a plaintiff satisfies its minimum contacts burden, the burden shifts to the defendant to demonstrate that exercising personal jurisdiction would nonetheless "offend traditional notions of fair play and substantial justice." *Dudnikov*, 514 F.3d at 1080. "Such cases are rare." *Rusakiewicz v. Lowe*, 556 F.3d 1095, 1102 (10th Cir. 2009). The defendant "must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Burger King Corp.*, 471 U.S. at 477; *Newsome v. Gallacher*, 722 F.3d 1257, 1264 (10th Cir. 2013).

As Plaintiff has not satisfied its burden to establish specific personal jurisdiction, the Court will not reach the analysis relating to notions of fair play and substantial justice.

## CONCLUSION

**IT IS ORDERED** that Grepow, Inc.'s Motion to Dismiss for lack of personal jurisdiction is **GRANTED** as described above.



**SARAH M. DAVENPORT**
**UNITED STATES DISTRICT JUDGE**